IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 1, 2020

## STATE OF TENNESSEE v. ANTHONY ELLIS

**Appeal from the Criminal Court for Shelby County**
**No. 17-02526      Chris Craft, Judge**

_____

### No. W2019-02081-CCA-R3-CD

_____

The Defendant, Anthony Ellis, was convicted by a Shelby County Criminal Court jury of first degree felony murder, attempted first degree premediated murder, a Class A felony, and attempted especially aggravated robbery, a Class B felony. *See* T.C.A. §§ 39-13-202 (2018) (subsequently amended) (first degree murder); 39-13-403 (2018) (especially aggravated robbery); 39-12-101 (2018) (criminal attempt). The trial court sentenced the Defendant to concurrent terms of life imprisonment for felony murder, eighteen years for attempted premeditated murder, and ten years for attempted especially aggravated robbery. On appeal, the Defendant contends that (1) the evidence is insufficient to support his felony murder conviction and (2) the trial court erred by admitting evidence in violation of Tennessee Rule of Evidence 404(b). We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined. JAMES CURWOOD WITT, JR., J., concurring in results only.

Robert Golder (on appeal and at trial) and Brett Stein (at trial), Memphis, Tennessee, for the appellant, Anthony Ellis.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon and Melanie Cox, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to a December 31, 2016 shooting, in which the Defendant, Muwani Dewberry, and Lloyd Crawford attempted to rob and kill Keith Crum. Mr. Dewberry was fatally shot during the incident and is the victim of the first degree felony murder conviction. Mr. Crum suffered a non-fatal gunshot wound to his hand and

is the victim of the remaining convictions. The Defendant and codefendant Crawford were tried jointly.

At the trial, Regina Sessel, Mr. Dewberry's mother, testified that her son was age thirty at the time of his death. She said that her son's nickname was "Black" and that codefendant Crawford's nickname was "Lil Boosie." She said that codefendant Crawford and her son "shared a grandmother" and that she had known codefendant Crawford all of his life. She said she had known the Defendant for about five years.

Memphis Police Officer Windless[1] testified that on December 31, 2016, he responded to the report of a shooting at the corner of Saxon and Cummings Streets and that he found Mr. Dewberry, who had been shot. Officer Windless said that Mr. Dewberry moaned but could not communicate and that nobody else was at the scene. Although none of the trial exhibits are included in the appellate record, a recording from a police body camera was received as an exhibit and played for the jury.

Memphis Police Officer Nathan Newman testified he responded to the scene where Mr. Dewberry was found and learned that a nearby home had security cameras that might have recorded what occurred. Officer Newman said he spoke to the homeowner, Bobbie Gant, who could not recall the passcode that would have allowed Officer Newman to retrieve the recordings.

Bobbie Gant testified that after she was unsuccessful in obtaining the security recordings at her home at the time Mr. Dewberry was found, the police took her security system for analysis to obtain the relevant recordings and returned it. She said that the officers were able to retrieve the recordings. She did not know the Defendant and codefendant Crawford.

Memphis Police Officer Charles Cathey testified that he took photographs and obtained blood and human tissue evidence from the sidewalk where Mr. Dewberry lay. Officer Cathey said that bullets and cartridge casings were not found at the scene and that the only evidence was blood and human tissue.

Memphis Police Sergeant Steven Easterwood testified that he obtained the "actual DVR box" from Ms. Grant's security system. He said that the relevant recording was retrieved and that the box was returned to Ms. Gant. Sergeant Easterwood identified photographs of the scene, which were received as exhibits.

---

[1] The record does not reflect Officer Windless's first name.

Memphis Police Lieutenant Clifton Dupree testified that he reviewed the recording obtained from Ms. Gant's security system. He said the recording showed that Mr. Dewberry was found on a "dead-end street," that a silver car drove within the camera's view, that a man left the car from the front passenger seat, that there was "some motion," that the man returned to the car, and that the car drove away. Lieutenant Dupree said that after the car drove away, something lay on the ground that had not been there before the car arrived. Lieutenant Dupree said that it had been Mr. Dewberry. The recording was played for the jury.

Lieutenant Dupree testified that after speaking with Mr. Dewberry's family, he reviewed recent police reports involving robberies and that he found a report referring to "three suspects in a silver car" who had robbed someone the same day Mr. Dewberry was found. He said that the report reflected Mr. Crum was the victim.

Bryttanie Burris testified that she had previous convictions for identity theft and possession of a controlled substance. She said that she was the mother of codefendant Crawford's child, that she lived in Mississippi, and that she and her children drove her silver 2004 BMW to Memphis in December 2016. Ms. Burris said that she stayed at codefendant Crawford's mother's home and that on the morning on December 31, she noticed her car was gone. She said codefendant Crawford "used" her car and that when he returned her car, it had a broken window, had been "through a car wash," and had been cleaned inside. She noted that she had two children and that her car generally contained "kids stuff," which was gone. She said that she smoked cigarettes inside her car but that the butts had been removed. She said that she did not "go into detail" with codefendant Crawford about what happened and that she thought he had cleaned her car as an apology for breaking the window. Ms. Burris said codefendant Crawford reported that he and his girlfriend argued, that his girlfriend broke the window during the argument, and that his girlfriend accused codefendant Crawford of cheating with Ms. Burris. She identified a photograph of her car, which was received as an exhibit. She did not know the Defendant and had never met him.

Keith Crum testified that he was age twenty-five at the time of the trial and that he had five children. Mr. Crum said that on December 31, 2016, a silver, four-door car pulled up as he stood on his front porch. He said that he approached the passenger window, that the front passenger, who was later identified at codefendant Crawford, asked to speak to a person who previously lived at the home, and that Mr. Crum did not know the person. Mr. Crum said that codefendant Crawford inquired about "cush," which Mr. Crum described as "a high tech form of marijuana," for the car's rear passenger. Mr. Crum said he told the men that Mr. Crum's friend might have marijuana and that codefendant Crawford requested four ounces. Mr. Crum said that the price would be $325 because cush was more

-3-

expensive than "regular" marijuana, that the men did not want to spend that much money, that Mr. Crum offered to sell the driver, who was later identified as the Defendant, 1.5 grams of Mr. Crum's personal marijuana for twenty dollars, and that the Defendant agreed. Mr. Crum said that the Defendant gave him $50, that Mr. Crum went inside his home to obtain the marijuana and $30 change, that he returned to the car, and that he entered the rear passenger seat. Mr. Crum said that he and the three men smoked marijuana.

Mr. Crum testified that the Defendant asked if Mr. Crum's mother-in-law was "the candy lady" and that Mr. Crum confirmed she was the candy lady. Mr. Crum explained that everyone knew his mother-in-law as the candy lady, who sold snacks, cigars, cigarettes, and drinks out of her home. Mr. Crum said that after they finished smoking marijuana, he attempted to open the door to leave the car but that the child safety lock was engaged. Mr. Crum said that he "never turned [his] head back around," that he "glanced up," that he saw only the "clip and gunfire," that he reached for the gun pointed at him, that he placed his hand on the barrel of the gun, and that he said, "Give me that." Mr. Crum said that the gun contained an extended magazine clip, which held twenty or more rounds, and was pointed "directly" at him. Mr. Crum said that codefendant Crawford fired the gun two additional times and instructed the rear passenger to search Mr. Crum's pockets. Mr. Crum said that the rear passenger "put his hands on" Mr. Crum's pockets but did not place his hands inside Mr. Crum's pockets. Mr. Crum said that the rear passenger placed his hand on Mr. Crum's pants pockets while Mr. Crum struggled for the gun. Mr. Crum said he and codefendant Crawford struggled while the gun "constantly" fired at least five times. Mr. Crum said he heard one of the passengers say, "Bro, you hit." Mr. Crum said that at some point during the shooting, he recalled that he, too, possessed a firearm, which had fallen from this right hip onto the rear seat. Mr. Crum said that he was able to grab his gun, that he raised it to fire, and that the gun struck the reclined seat and fell on the floorboard. Mr. Crum said that he screamed for the men not to kill him, that he rolled down the window, that he was able to escape through the window, and that he left his gun behind. He said his fiancée called the police.

Mr. Crum testified that he was shot in the left hand during the incident. He said his hand throbbed with pain and "felt like a tail wagging." He saw a lot of blood, that an ambulance took him to the hospital, and that his hand required surgery. He recalled that a physician stuck a finger through the wound to ensure the bullet was not inside his hand and that this was painful. He showed the jury the scar from the bullet wound. He said that his hand continued to ache and that if he felt pain he could not lift dishes, although he was a cook. He admitted that on January 13, 2017, he suffered a second gunshot wound to his left hand after the incident in this case, that he had been "playing" with a gun when it discharged, and that the wound was in a different location on his hand.

-4-

Mr. Crum testified that he identified the Defendant, codefendant Crawford, and the rear passenger in photograph lineups. The lineups were received as exhibits.

On cross-examination, Mr. Crum testified that he did not offer anyone inside the car one-quarter of one pound of marijuana but that they asked for this amount. Mr. Crum said that he did not have that much marijuana. Mr. Crum said that the men did not say anything before the shooting began. Mr. Crum said that the Defendant told the rear passenger to go through Mr. Crum's pockets. Mr. Crum thought he was shot when the gun was fired for the second or third time and said he fought for his life inside the car. He agreed that the rear passenger was deceased because the rear passenger was shot during the incident.

Memphis Police Officer Nacarious Lucas testified that he responded to Mr. Crum's home on December 31, 2016, at 10:20 a.m. Officer Lucas said that Mr. Crum provided a description of the three men involved in the shooting and of the silver car. Officer Lucas said that Mr. Crum had a gunshot wound to his left hand and that Mr. Crum was upset and in pain.

T.D.[2] testified that he was age fifteen at the time of the trial and that Mr. Dewberry was his uncle. T.D. stated that on December 31, 2016, he saw Mr. Dewberry at the apartment of "Grandma Mary" around 8:00 a.m. T.D. said that "Boosie and Ant" were with Mr. Dewberry. Although T.D. did not know their legal names, he identified codefendant Crawford as Boosie and the Defendant as Ant. T.D. said that he saw the men leave his cousin's apartment, that Mr. Dewberry had a gun, and that this was the first time he had seen Mr. Dewberry with a firearm. T.D. said that codefendant Crawford and Mr. Dewberry left in a gray BMW. T.D. identified a photograph of the gray BMW, which Ms. Burris had identified as her car. T.D. recalled that codefendant Crawford drove the BMW and that Mr. Dewberry sat in the rear passenger seat. T.D. said that the Defendant got inside a green Nissan Maxima. T.D. said that Mr. Dewberry left the BMW, walked to Grandma Mary's apartment, changed his clothes, returned to the parking lot, and entered the Maxima. T.D. recalled that when Mr. Dewberry returned, his clothes were black, that the men left between 8:00 and 9:00 a.m., and that he had never seen the BMW previously. T.D. admitted that he had a juvenile adjudication for facilitation of aggravated robbery.

On cross-examination, T.D. testified that he saw the gun on Mr. Dewberry's hip and that the "clip was hanging out." T.D. agreed that the Defendant and codefendant Crawford did not have any guns. T.D. said that the Defendant drove away in the Nissan and that the Defendant was not wearing black clothes. On redirect examination, T.D. said that he never

---

[2] It is the policy of this court to refer to juveniles by their initials.

saw the Defendant and codefendant Crawford at the apartment complex after the shooting, although they had been there frequently before the shooting.

Memphis Police Sergeant John Stone testified that he processed the 2004 silver BMW for fingerprints and blood evidence. Photographs of the car were received as exhibits. He identified photographs that he said showed the presumptive presence of blood on the rear driver's side door handle, driver's side floorboard, the front passenger seat and floorboard, glovebox, "center armrest," and rear driver's side seat and floorboard. He identified photographs that he said showed floormats found inside the trunk and the presumptive presence of blood. He likewise identified a photograph that showed a broken rear driver's side window and said the window had the presumptive presence of blood. On cross-examination, Sergeant Stone testified that he did not find holes in the floorboards or floormats.

Memphis Police Sergeant Russell Noel testified that he investigated Mr. Dewberry's death. Sergeant Noel reviewed the security recording obtained from Ms. Gant and said the time stamp was "off an hour." He said the recording showed that a silver BMW drove to the location where Mr. Dewberry was found, that a man left the car from the front passenger seat, that the man "removed" Mr. Dewberry from the car, that the man placed Mr. Dewberry on the sidewalk, that the man returned to the car, and that the car drove away. Sergeant Noel said the recording showed that the driver's side "vent window" was broken.

Sergeant Noel testified that he learned Ms. Burris owned the BMW and lived in Olive Branch, Mississippi, and that he traveled to Mississippi to speak with her. He said that when he met with Ms. Burris, he noticed that the driver's side vent window was "busted out" of the car. He said that Ms. Burris was cooperative and allowed him to tow the car to Tennessee. He noted that all four seats tested positive for blood. He said that he spoke to Mr. Dewberry's family and that afterward, he began investigating robberies involving three suspects. He said that during his investigation he learned of the robbery-shooting incident in which Mr. Crum had been the victim.

Sergeant Noel testified that the fingerprint evidence collected from the BMW did not result in any evidence of value. He said that he spoke to T.D. and Rhia Perry, that the Defendant and codefendant Crawford became persons of interest to the police, and that the men were located after a be on the lookout (BOLO) alert was issued.

Sergeant Noel testified that the closest hospital was two blocks from the scene of the shooting involving Mr. Crum. Sergeant Noel said that there were ten fire stations and one hospital between the scene of the shooting and the location where Mr. Dewberry was found. Sergeant Noel said that it took thirty seconds to drive from the scene of the shooting

to the hospital. Sergeant Noel said that it took ten to fifteen minutes to drive from the location of the shooting to the location where Mr. Dewberry was found.

Memphis Police Officer Michael Jackson testified that on January 13, 2017, he saw the Defendant walking down the street after a BOLO had been issued. Officer Jackson said that he approached the Defendant, that he told the Defendant they needed to talk, and that the Defendant asked what the Defendant had done. Officer Jackson said that police dispatch advised the Defendant might have been armed, that Officer Jackson saw a "bulge" in the Defendant's jacket pocket, that Officer Jackson drew his weapon, and that the Defendant ran. Officer Jackson said that after a foot chase, the Defendant hid under a home and was ultimately apprehended.

Dr. Marco Ross, an expert is forensic pathology, reviewed the records from Mr. Dewberry's autopsy and testified that Mr. Dewberry sustained a gunshot wound to the left side of the head above the left ear. Dr. Ross said that the bullet traveled through the skull and exited the back of the head. He said that the gunshot wound was the cause of death and that the manner of death was homicide. He noted that the brain was swollen, which impacted cardiac and respiratory functions, and that it was possible Mr. Dewberry's condition could have improved if he had been taken to the hospital sooner. Dr. Ross said that the treatment to reduce brain swelling could only be administered at a hospital and that Mr. Dewberry did not have any preexisting medical conditions or diseases. Dr. Ross said that "individuals that sustain injuries to this part of the brain can survive," although "some diminishment of . . . functions" would most likely exist afterward. Photographs taken during the autopsy were received as exhibits.

Dr. Ross testified that Mr. Dewberry's gunshot wound was consistent with his sitting in the back seat of a car, a gun being fired from the front passenger seat, and his turning his head to the left.

Rhia Perry testified that she and the Defendant, whom she referred to as "Free Band," dated previously and that she knew codefendant Crawford by the nickname Boosie. She said that Mr. Dewberry was the father of her cousin's four children. Ms. Perry said that on December 31, 2016, she and the Defendant were still involved romantically and that she shared an apartment with her cousin. Other evidence established that the apartment was located at the same complex at which T.D. stated he had seen Mr. Dewberry, the Defendant, and codefendant Crawford on the day of the shooting. Ms. Perry said that on December 31, at 8:00 or 9:00 a.m., the Defendant and Mr. Dewberry were at her apartment and that the men discussed going to "this dude Dread's house." She said that the men discussed robbing Dread and that Mr. Dewberry took a "black ski hat . . . and he cut the eyes off of it." Ms. Perry said that the Defendant had a handgun when he arrived at the

apartment, that the Defendant retrieved another gun from a duffle bag, and that the Defendant gave the gun to Mr. Dewberry. Ms. Perry said that the men left the apartment but that the Defendant returned thirty to forty-five minutes later. She said the Defendant drove a Nissan Maxima.

Ms. Perry testified that the Defendant was "panicking real bad," "hesitant to speak," and "scared" when he returned to her apartment. She said that as they sat in the Defendant's car, the Defendant told her that Mr. Dewberry had been shot in the head while they were inside a car and that Mr. Dewberry was still breathing. She said that after their discussion, she returned to her apartment, and the Defendant left. She said that she learned about Mr. Dewberry's death from Detective Noel two or three days after the shooting.

Ms. Perry testified that she moved to a room at the Sun Inn motel a couple of weeks after Mr. Dewberry's death. She said that the Defendant came to the motel to visit her, that he left to walk to the store, and that the Defendant never returned. She said the police came to her motel room on the same night. She said she cooperated with the police.

Ms. Perry testified that she was in jail for three pending theft cases and that she had previous convictions for criminal impersonation and felonious failure to appear. She denied the State had promised her anything in exchange for her testimony.

Ms. Perry testified that the Defendant said that the men went to Dread's home, that the Defendant knocked on the door, and that the Defendant returned to his car. Ms. Perry said that they left and drove to East Memphis to purchase marijuana from "some guy" but that she was unaware if they bought any. She said that the Defendant said "a robbery was supposed to take place," that Mr. Dewberry and "the guy" struggled, and that Mr. Dewberry was shot during the incident. Ms. Perry said that the Defendant was the driver during the robbery and that she learned later the car was a silver BMW. She said that the Defendant only talked about robbing Dread. She did not know Mr. Crum. Ms. Perry said the Defendant stated that after the shooting, "they had put [Mr. Dewberry's] body out," called 9-1-1, and broke the cell phone used to place the call.

The Defendant and codefendant Crawford elected not to present any proof.

Upon this evidence, the jury convicted the Defendant of first degree felony murder of Mr. Dewberry during the perpetration or attempt to perpetrate a robbery, attempted first degree premeditated murder of Mr. Crum, and attempted especially aggravated robbery of Mr. Crum. This appeal followed.

# I.  Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his first degree felony murder conviction pursuant to a theory of criminal responsibility because he did not participate in the robbery.  He argues that the evidence failed to establish that he was criminally responsible for Mr. Dewberry's attempt to rob Mr. Crum and for codefendant Crawford's "unprovoked gunshots fired at" Mr. Crum.  The State responds that the evidence is sufficient.  We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).  The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521.  The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).  A conviction may be based upon circumstantial evidence alone.  *See Dorantes*, 331 S.W.3d at 380-381.

As relevant to the present case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]"  T.C.A. § 39-13-202(a)(2) (2018).  Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a) (2018).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id*. § 39-11-401(a) (2018).  "Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *Dorantes*, 331 S.W.3d at 386 (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

A person is criminally responsible for an offense committed by the conduct of another, if:

. . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2018). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994). A defendant's "presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." *State v. Watson*, 227 S.W.3d 622, 639 (Tenn. 2006). Furthermore, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime[.]" *Id.*

In the light most favorable to the State, the evidence reflects that on the morning of the shooting, Mr. Dewberry, the Defendant, and codefendant Crawford arrived at an apartment complex. Codefendant Crawford arrived in a silver BMW belonging to Ms. Burris, and the Defendant arrived in his Nissan Maxima. The Defendant and Mr. Dewberry visited Ms. Perry's apartment. Although the Defendant already possessed a handgun, he retrieved another handgun from a duffle bag inside the apartment and gave it to Mr. Dewberry. While the Defendant retrieved the handgun, he and Mr. Dewberry discussed committing a robbery. Ms. Perry said the Defendant stated that "a robbery was supposed to take place." Mr. Dewberry took a "black ski hat . . . and cut the eyes off of it." When leaving the apartment complex, Mr. Dewberry initially entered the rear passenger seat of the silver BMW but left the car, walked to an apartment to change into black clothes, and entered the Defendant's car when he returned to the parking lot.

Sometime after the men departed from the apartment complex, the Defendant drove the BMW to Mr. Crum's home. The men discussed marijuana, and Mr. Crum agreed to sell the Defendant a portion of Mr. Crum's marijuana. The Defendant provided cash for the marijuana, and Mr. Crum retrieved change and marijuana from inside the home. Mr. Crum entered the rear passenger seat, and the men smoked marijuana. Mr. Dewberry sat beside Mr. Crum, the Defendant was in the driver's seat, and codefendant Crawford was the front passenger. After the men finished smoking marijuana, Mr. Crum was unable to leave the car because the child safety locks were engaged. Without speaking, codefendant

-10-

Crawford began shooting at Mr. Crum, and a struggle ensued between Mr. Crum and codefendant Crawford for control of the handgun. During the struggle, Mr. Dewberry searched Mr. Crum's pockets at the Defendant's direction. Although Mr. Crum was able to escape the car with a single gunshot wound to the hand, Mr. Dewberry sustained a fatal gunshot wound to the head. After the robbery, the Defendant and codefendant Crawford drove Mr. Dewberry, who was still alive at this time, to a dead-end street, removed Mr. Dewberry from the rear passenger seat and placed him on the sidewalk, and left. Later, the Defendant told Ms. Perry that Mr. Dewberry had been shot during the robbery, that "they had put [Mr. Dewberry's] body out," called 9-1-1, and broke the cell phone used to place the call.

We conclude that the evidence is sufficient to support the Defendant's conviction for criminal responsibility for the conduct of Mr. Dewberry and codefendant Crawford. The evidence supports a determination that the Defendant knowingly and voluntarily shared in the criminal intent of the crimes and promoted their commission. The jury could have reasonably inferred from the Defendant's conduct before and after the commission of the offenses that the Defendant acted with the intent to assist in the armed robbery, resulting in Mr. Dewberry's death. *See Dorantes*, 331 S.W.3d at 386; *Maxey*, 898 S.W.2d at 757; *see also Watson*, 227 S.W.3d at 639. The Defendant is not entitled to relief on this basis.

## II.  Tennessee Rule of Evidence 404(b)

The Defendant contends that the trial court erred by admitting Rhia Perry's testimony that the Defendant and Mr. Dewberry "had contemplated a robbery" of a person identified as Dread. The Defendant argues that the evidence constituted inadmissible prior bad acts pursuant to Tennessee Rule of Evidence 404(b). The State responds that the evidence did not implicate Rule 404(b) and that the evidence was relevant to establishing the Defendant's intent.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is for an abuse of discretion, provided a trial court substantially complied with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

During a jury-out hearing, the defense counsel objected to the State's eliciting testimony from Ms. Perry that "these guys were going to do a lick and then went out to do another lick." The defense argued that the anticipated evidence from Ms. Perry violated Tennessee Rule of Evidence 404(b). Ms. Perry did not testify during the jury-out hearing. The trial court determined that the evidence was relevant to showing the intent of the Defendant, codefendant Crawford, and Mr. Dewberry to "commit one robbery and then . . . another robbery, the incident robbery." The court determined that the evidence was

probative of the Defendant's intent to commit the robbery in which the killing occurred and that the evidence was not unfairly prejudicial.

Generally, Tennessee Rule of Evidence 404(b) addresses the admissibility of prior crimes and bad acts. *See State v. Reid*, 213 S.W.3d 792, 813-814 (Tenn. 2006) (concluding that previous possession of a handgun and knife are not prior bad acts or crimes "standing alone" and does not implicate Rule 404(b)). *But see State v. Clark*, 452 S.W.3d 268, 289-90 (Tenn. 2014) (concluding that although possession and use of adult pornography are not unlawful acts, "many people consider it a moral 'wrong'" and that, as a result, Rule 404(b) governs the admissibility of such evidence). Ms. Perry testified that at her apartment on the day of the shooting, the Defendant and Mr. Dewberry discussed robbing a person identified as Dread. She likewise testified that the contemplated robbery never occurred. We conclude that, based upon the facts of the present case, the discussion and contemplation of committing a crime or engaging in criminal wrongdoing does not implicate Rule 404(b) because it is not a prior bad act. As a result, the admissibility of the evidence is governed by the rules of relevancy.

The trial court determined that the evidence was relevant to establishing the Defendant's intent, along with the intent of his co-conspirators, to commit the robbery in which Mr. Dewberry was shot and later died and that the evidence was not unfairly prejudicial. *See* Tenn. R. Evid. 401, 403. The record supports the trial court's determinations. The evidence established the Defendant's intent to commit the robbery against Mr. Crum. Likewise, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The record reflects that the Defendant told Ms. Perry the contemplated robbery of Dread never occurred. Therefore, the trial court did not abuse its discretion by admitting the relevant evidence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-13-